# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PATRICK J. TURNER,                        )
                                          )
    Plaintiff,                       )
                                          )   **No. 07 C 1520**
    v.                               )
                                          )   **Mag. Judge Michael T. Mason**
MICHAEL J. ASTRUE                         )
Commissioner of Social Security,          )
                                          )
    Defendant.                       )

## MEMORANDUM OPINION AND ORDER

MICHAEL T. MASON, United States Magistrate Judge.

Plaintiff Patrick Turner ("Turner") filed a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Turner's claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 216(i) and 223. The Commissioner filed a cross-motion for summary judgment asking this Court to uphold the decision of the Administrative Law Judge . This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's cross-motion for summary judgment is granted and Turner's motion for summary judgment is denied.

## PROCEDURAL HISTORY

Turner filed his application for disability insurance benefits on December 5, 2002, alleging an onset date of June 6, 1999. (R. 67-72). Turner's claim was denied initially and again upon reconsideration. (R. 34-37; 40-43). Turner filed a timely request for a hearing, which was held on December 1, 2005 before Administrative Law Judge E. James Gildea ("ALJ Gildea"). David A. Bryant appeared on Turner's behalf and

represented him in connection with that hearing. (R. 44). On March 14, 2006, ALJ Gildea issued a written decision denying Turner's request for benefits. (R. 20-29).

On May 8, 2006, Turner filed a timely request for review before the Appeals Council. (R. 14). Subsequently, Turner submitted additional medical evidence through his new counsel, James T. Reilly. (R. 204-95). The Appeals Council denied Turner's request for review on January 26, 2007, and ALJ Gildea's decision became the final decision of the Commissioner. (R. 5-8); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).

## I.    BACKGROUND

### A.    Medical Evidence

To support his claim for benefits, Turner submitted medical records from a number of sources, including Dr. Leonard Rutkowski ("Dr. Rutkowski"), a neurologist. (R. 158-67, 202-03). Turner received treatment from Dr. Rutkowski from June 21, 1999 to October 2, 2003. (*Id.*). At Dr. Rutkowski's recommendation, Turner underwent a lumbar MRI scan on June 30, 1999. (R. 205). The MRI revealed bulging disc annuli at L2-L3, L3-L4, L4-L5, and L5-S1, no definitive focal disc herniation, and a minimal left-sided L5-S1 disc herniation. (*Id.*). The reviewing radiologist, Dr. Vinod Patel ("Dr. Patel"), concluded that Turner had "mild uniform bulging disc annuli, lumbar levels." (*Id.*).

On July 8, 1999, prior to visiting Dr. Rutkowski, Turner received a lumbar epidural steroid injection. (R. 133). On May 22, 2000, Turner received a paravertebral trigger point injection and a cardial epidural steroid injection. (R. 129). Dr. Rutkowski prescribed a "muscle simulator," which Turner used approximately twice a week from

June 19, 2000 to June 6, 2002.  (R. 225-33).

On August 3, 2000, Dr. Matthew Ross ("Dr. Ross"), a neurologist, examined Turner in connection with his workers' compensation claim.[1]  (R. 155).  At that time, Turner reported that he injured his back on July 7, 1998 while throwing a couple of buckets of fireproofing paint at the LaSalle Nuclear Plant.  (*Id.*).  Turner informed Dr. Ross that the pain had recently localized into his lower back, extending into his right buttock and pelvis area.  (*Id.*).  Turner stated that he tried numerous medications including anti-inflammatories, narcotic analgesics, an anticonvulsant, antidepressants, and muscle relaxants, none of which provided adequate relief.  (*Id.*).  Dr. Ross noted Turner's current medications of Vicodin, Tylenol and ibuprofen, and further noted that Turner took three to four Vicodin each day.  (R. 155-56).

Upon examination, Dr. Ross found that Turner's "gait is abnormal because of the position of his lower back."  (R.  156).  Dr. Ross did not notice any significant muscle spasms or sciatic notch tenderness, and observed that Turner performed toe and heel walking with "good strength."  (*Id.*).  The doctor's examination of Turner's lower back revealed "markedly decreased range of motion on forward flexion and extension."  (*Id.*).  While Turner could only bend forward at the waist forty-five degrees, his side bending was more "modestly restricted."  (*Id.*).  Dr. Ross found Turner's pinprick sensation to be intact, although minimally reduced over his entire left leg.  (*Id.*).  Dr. Ross also noted that Turner had mild tenderness to palpation over his lower lumbar and sacral paravertebral muscles and some tenderness over his right upper gluteal musculature.

---

[1]Turner's workers' compensation claim is not before this Court.

3

(*Id.*).

Dr. Ross reviewed two sets of lumbar x-rays from July 1998 and one from 1999 and concluded that they show "only minimal degenerative change with no evidence of fracture, spondylolysis or spondylolisthesis." (R. 156). He opined that Turner's symptoms "sounded like typical sciatic pain, most likely due to the L5-S1 herniation." (*Id.*). The doctor also noted that "[t]he radicular symptoms have improved substantially," but Turner "continues to have disabling lower back pain." (*Id.*). Dr. Ross stated that the source of the back pain "remains uncertain at this time," and that "[p]ain from a lumbosacral strain should have resolved within two years of the accident." (*Id.*). He suggested that Turner's mechanical lower back pain "may be dis[c]ogenic or originating from a facet joint" and recommended that Turner begin working with an anesthesia pain specialist trained in the evaluation and treatment of chronic pain conditions. (*Id.*). Dr. Ross opined that surgery was not an option until the precise source of pain could be identified. (*Id.*). Finally, Dr. Ross found that claimant was "definitely not at maximum medical improvement" and it did not appear that he could function even in a sedentary capacity. (R. 157).

Dr. Ross referred Turner to Dr. John Gashkoff ("Dr. Gashkoff"), who performed an examination on August 24, 2000. (R. 150-51). Dr. Gashkoff observed that Turner walked with a limp and had good strength in heel and toe walking. (R. 150). He noted that Turner's sensation was intact to light touch and that Turner experienced pain to palpation over his lumbar paraspinal muscles bilaterally. (*Id.*). Dr. Gashkoff opined that Turner suffers from chronic back pain that "has failed conservative therapy" and "appears . . . largely mechanical." (*Id.*). Dr. Gashkoff recommended that Turner

undergo a diagnostic lumbar facet nerve block and, if that did not alleviate his symptoms, a provocative discogram pain study. (R. 151). Dr. Gashkoff also refilled Turner's prescription for Vicodin and instructed him to take one tablet every four hours as needed for pain, with a maximum of three tablets per day. (*Id.*).

Turner did not appear for his appointments with Dr. Rutkowski in November and December 2000 (R. 165). Dr. Rutkowski's January 15, 2001 treatment notes indicate that Dr. Gashkoff performed a provocative discogram pain study on November 16, 2000. (R. 164). The record before this Court does not include a report from that study. However, Dr. Rutkowski noted that Turner "had a discogram which was essentially negative." (*Id.*).

Turner returned to Dr. Rutkowski for treatment on February 2, 2001. (R. 164). The doctor's notes from that visit state: "Discogram negative. Talked to Dr. Gashkoff at Edwards Hospital. Does not feel that this patient is fully compliant and there may be psychological issues involved. I have to agree." (*Id.*). Claimant returned to Dr. Rutkowski on May 1, 2001. (R. 163). At that time, Dr. Rutkowski noted that claimant was "[n]ot allowed to see physical therapy for insurance" and complained of significant pain and discomfort in his left knee. (*Id.*). Dr. Rutkowski refilled Turner's prescriptions for Ultram and Vicodin and referred him to a Dr. Bertolini. (*Id.*). The record does not indicate whether Turner did, in fact, receive treatment from Dr. Bertolini.

On May 17, 2001, Dr. Ross examined Turner for a second time. (R. 153-54). Turner reported ongoing lower back pain and a numbing sensation in his left leg, along with a brief "lightening-like" pain in his back for the past "1-1/2 weeks." (R. 153). At that time, Turner's daily medication regime consisted of three and a half Vicodin, two Ultram,

and an unknown muscle relaxant. (*Id.*). Dr. Ross observed that Turner's gait was normal and he performed heel and toe walking well. (*Id.*). Dr. Ross did not find any sacroiliac joint or sciatic notch tenderness. (*Id.*). Dr. Ross noted that Turner still had a minimally restricted range of motion in his lumbar spine on forward flexion and extension and mild tenderness to palpation over his right lower lumbar paravertebral muscles. (*Id.*).

Dr. Ross reviewed a functional capacity evaluation performed in December 2000 (the "2000 FCE") in conjunction with Turner's workers compensation case.[2] (R. 153). He stated that the 2000 FCE "raised the question of some nonorganic aspects to pain" and that "[t]here was concern for symptom magnification." (*Id.*). Dr. Ross noted that the 2000 FCE "appeared to identify that [Turner] was capable of lifting in the 25-pound range." (*Id.*). Dr. Ross concluded that Turner was at "maximum medical improvement for his back injury." (R. 154). Dr. Ross opined that "[t]here is no role for surgery in the management of this [back] problem" and additional physical therapy would not be of much use. (*Id.*). Dr. Ross informed Turner that he would have to live with a certain degree of discomfort, and would require "ongoing use of both narcotic and muscle relaxant medication." (*Id.*). He opined that it is "clear" claimant will not be able to work at the very heavy physical demand level again, but it is "realistic" that he should be able to work at the 25-pound lifting level. (*Id.*). Finally, Dr. Ross observed that Turner "has a great deal of fear about how this is going to impact his ability to be employed as an industrial painter," and opined that addressing Turner's fear might help facilitate his

---

[2]The actual 2000 FCE is not included in the record.

return to work.  (*Id.*).

On June 25, 2001, Turner again sought treatment from Dr. Rutkowski.  (R. 162).

Dr. Rutkowski recommended that Turner attend a pain clinic and consider using a

dorsal column simulator.  (*Id.*).   The doctor's treatment notes also state: "Patient

referred to St. Joe's or Silver Cross; he is to decide.  Also wrote order for physical

therapy to determine acceptability per insurance and his lawyer."  (*Id.*).  Dr. Rutkowski's

September 7, 2001 treatment notes state "[o]ptions for chronic low back pain: pain pills,

pain clinic, fusion only as a last resort since discogram is not positive indicating

recurrence of pain."  (R. 161).  Dr. Rutkowski prescribed Ultram and OxyCotin "to see

whether or not this helps relieve pain and discomfort."  (*Id.*).   On November 9, 2001,

Turner returned to Dr. Rutkowski who noted that "[p]ain clinic still in limbo; insurance

issues."  (R. 160).  The doctor prescribed Vicodin with two refills and noted Turner's

understanding that "this is just pain medication for the time being until all legal issues

are resolved."  (*Id.*).

On September 12, 2002, Turner informed Dr. Rutkowski that the muscle

simulator "work[ed] but has stopped working."  (R. 159).  The doctor again

recommended pain management.  (*Id.*).  Dr. Rutkowski's notes also state "Disability in

question.  No insurance."  (*Id.*).   Claimant's medical records include a statement signed

by Dr. Rutkowski on October 29, 2002 verifying that claimant is under treatment and

stating that he is "totally disabled (unable to work)" at "any and all occupations."  (R.

225).

On December 27, 2002, Disability Determination Services ("DDS") physician

James Graham ("Dr. Graham") completed a residual functional capacity assessment of

7

Turner (the "2002 RFC").  (R. 170-177).  Dr. Graham found that Turner could occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk about six hours in an eight-hour workday; and occasionally climb, balance, kneel, crouch, and crawl.  (R. 171-72).  In the "Additional Comments" section of the 2002 RFC, Dr. Graham stated that a June 30, 1999 MRI showed degenerative disc changes at L5-S1, x-rays showed minimal degenerative changes, and Turner's gait was normal.  (R. 177).  A stamp on the last page of the 2002 RFC, dated February 28, 2003, states that Stanley A. Burris, M.D.  "reviewed all of the evidence in [the] file and the assessment of 12-27-02 is affirmed as written."  (*Id.*).

On May 22, 2003, Dr. Aftab Kahn ("Dr. Kahn") examined Turner at the request of the DDS.  (R. 178-83).  He noted Turner's complaints of a constant dull, aching lower back pain that radiated to his left lower extremity.  (R. 178).  Dr. Kahn observed that it was difficult for Turner to get on and off the examination table.  (R. 181).  The doctor noted Turner's characterization of squatting and rising as "painful."  (*Id.*).  Dr. Kahn found that Turner could not perform tandem walking, walking on toes and heels, or hopping on one leg; that Turner could walk fifty feet without using assistive devices but limped during walking; and that Turner's sensation was intact upon pinprick to both lower extremities.  (*Id.*).  Dr. Kahn concluded that Turner had moderate limitation of motion in his lumbosacral spine and could accomplish forward flexion to forty degrees and lateral flexion to twenty degrees.  (R. 181-82).  Finally, Dr. Kahn opined that Turner could lift five pounds, but that he could not carry it because of pain in his lower back.  (R. 182).

On July 28, 2003, DDS physician Sandra Bilinsky ("Dr. Bilinsky") completed a

second RFC assessment of Turner (the "2003 RFC"). (R. 185-93). Dr. Bilinsky memorialized Turner's complaints of a dull, aching pain associated with tingling and numbness that radiated to his left lower extremity. (R. 192). Dr. Bilinsky opined that Turner could walk fifty feet without assistive devices, had muscle spasms in his lumbosacral spinal area, and had moderate limitation of motion in his lumbar spine area, accomplishing forward flexion of cervical, thoracic, and lumbar spine to forty degrees. (*Id.*). She also noted that Turner's upper extremities were normal and lower extremities had "no limitation of motion of any joint." (*Id.*). Turner's neurological exam was normal, his sensation was intact, and Dr. Bilinsky did not find any muscle atrophy. (*Id.*).

After reviewing a July 3, 2003 x-ray, Dr. Bilinsky concluded that Turner had mild degenerative spurring involving the anterior aspect of the L3 and L4 vertebral bodies and minimal material listhesis of L5 on L4. (R. 193). Dr. Bilinsky found that Turner could occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk for about six hours in an eight-hour work day; sit for about six hours in an eight-hour work day, and occasionally, climb, balance, kneel, crouch, and crawl. (R. 186-87). Dr. Bilinsky concluded that Turner was capable of light work activity. (R. 193).

Nurse-Practitioner Patricia Duffield ("Nurse Duffield"), who worked in the office of Dr. John Podzamsky ("Dr. Podzamsky"), administered Turner's medication from January 21, 2002 to January 5, 2005. (R. 194). During that time, Turner was repeatedly prescribed Vicodin and Ultram. (*Id.*).

On November 14, 2005, Nurse Duffield completed a RFC assessment (the "2005 RFC"). (R. 197-201). Dr. Podzamsky's stamp is on the last page of the 2005 RFC. (R.

201).  According to Nurse Duffield's notes, Turner reported sharp, severe pain radiating from his left L3-L4 level to his left leg and foot.  (R. 197).  Nurse Duffield indicated that Turner could not fully flex his back and had an abnormal gait, muscle spasms in his back, and sensory loss and reflex changes in his left leg and foot.  (R. 198).  She found that Turner had muscle weakness and muscle atrophy, with his left calf measuring 16 ½ inches and his right calf measuring 18 inches.  (*Id.*).  Nurse Duffield found that Turner could sit for five minutes; stand for ten minutes; and sit, stand and/or walk for less than two hours in an eight-hour work day.  (R. 198-99).  She indicated that Turner needed to walk around every five minutes and would need to take unscheduled breaks of five to ten minutes every thirty minutes.  (R. 199).  Nurse Duffield opined that Turner could occasionally lift less than ten pounds, could never bend or climb ladders, and could rarely twist, crouch, or climb stairs.  (R. 199-200).  She also stated that Turner's impairments were "reasonably consistent" with his symptoms and functional limitations.  (R. 198).

### B.    Claimant's Testimony

Claimant testified at the hearing held before ALJ Gildea.  (R. 301-45).  Turner's date of birth is August 14, 1958.  (R. 301).  At the time of the hearing, he was forty-seven years old and lived in a two-story home in Streator, Illinois.  (R. 302-03).  He is married and has five children, three of whom live in the home.  (R. 304).  Turner left high school at the beginning of twelfth grade, and subsequently passed the general education development test.  (R. 306).  According to his testimony, Turner last worked in June 1999 in a light duty capacity for Streator Decorators.  (R. 307). He worked for

approximately six weeks before being "taken off work by the neurosurgeon."  (*Id.*).

Prior to that, Turner worked for different painting contractors "mostly [at] nuclear plants,

[for] probably close to 17 years."  (*Id.*).

Turner testified that he injured his back while working at the LaSalle Nuclear

Plant.  (R. 308).  When he sought medical treatment for that injury, Dr. Rutkowski "found

this existing deterioration that [he] already had."  (R. 315).  According to claimant, Dr.

Rutkowski informed him that "with the injury that [he] had it just  . . .  put [him] over the

edge with the deterioration of the spine, and that at the time  . . .  [he] had the spine of a

70-year-old."  (R. 316).  Dr. Rutkowski took claimant "off work and told [him] the

options," namely that "the lowest vertebrae needed to be fused but couldn't be."  (*Id.*).

Turner stated that Dr. Rutkowski told him he should seek disability because of his

condition.  (R. 317).

Claimant has not had back surgery.  (R. 316).  Turner recalled receiving at least

three spinal epidurals in 2001.  (R. 315).  He also sought treatment from "a physical

therapy regimen in town there which really didn't do much good," and saw various

workers' compensation doctors.  (R. 313).  Turner stated that he had undergone "a lot of

things that just didn't work."  (R. 315).

Turner testified that he continued to see Dr. Rutkowski until the doctor left the

state approximately a year and a half before the hearing.  (R. 310).  Turner then began

seeing Nurse Duffield three or four times a year.  (*Id.*).  Turner stated that he did not get

any MRI's or x-rays in the last five years for financial reasons.  (R. 314, 337).  As of the

hearing date, neither Turner nor his wife had health insurance or any type of medical

coverage.  (R. 337).

Turner testified that he suffers from a constant stabbing, numbing pain in his lower back.  (R. 324).  He stated that the pain occasionally shoots down his left leg, and that his left leg is numb most of the time.  (R. 324-25).   Turner has no real problems with his arms.  (R. 326).  However, he testified that he "used to be a bodybuilder" and his arms are not as strong as they once were.  (*Id.*). He uses a cane approximately twice a month when he has "bad days."  (R. 328).

Claimant spends approximately twelve hours a night in bed, and his most comfortable position is lying flat on his back.  (R. 318-19).  He usually stays up until midnight watching television, sleeps for "maybe an hour or two" and then intermittently sleeps until 7:00 a.m.  (R. 319-20).  Turner stated that he lies down approximately twelve times during the day for a total of three to five hours.  (R. 320, 336).  Turner takes four or five Hydrocodone and four or five Ultram each day.  (R. 308).  According to Turner, when he lies down and takes medication, the pain in his back goes away.  (R. 337).

Turner stated that it takes him "about an hour to get going" each morning.  (R. 318).  After taking a pain pill, he walks his youngest daughter to the bus stop "about a half a block" and then "piddle[s] around the house."  (*Id.*). He can "stand for a little while, sit for a little while, lay down for a little while."  (*Id.*).  Turner vacuums three to five times each week, does the dishes twice a day, and occasionally sweeps and cooks.  (R. 321, 339-40).   Turner tries to do yard work, including mowing the lawn, a couple of times a month.  (R. 318, 340).  He stated that "it ain't like it used to be  . . .  it takes me a hell of a lot longer  . . .  I can't do what I used to do."  (R. 318).

Claimant belongs to a sportsman's club and occasionally goes fishing.  (R. 322).

Turner used to spend "quite a bit" of time on the shooting range, but hasn't been able to shoot in three or four years. (*Id.*). Turner stated that he and his family used to vacation in the Wisconsin Dells twice a year, but have not taken a vacation in approximately four years. (R. 323).

Turner leaves the house to go grocery shopping a few days a week for ten to fifteen minutes. (R. 321). He explained that he does not have any problem carrying his groceries into the house, although his sons will help him if they are around. (R. 343-44). Turner occasionally drives his family's Dodge Ram truck. (R. 304, 325). He testified that he has not looked for work because he is "not really sure what's available . . . There was nothing there to begin with." (R. 330). Turner stated that he "can sit for only ten minutes . . . can't even work at a desk. Can't lift nothing." (*Id.*). He also doesn't know how he could concentrate, and wonders if an employer would tolerate his need to miss "a day a week or every other couple" of days due to pain. (*Id.*).

### C.    Vocational Expert's Testimony

Dennis Gustafson testified as the vocational expert ("VE Gustafson"). (R. 345-56). VE Gustafson described Turner's past work as a painter as skilled and medium to heavy, but mostly medium. (R. 346). The ALJ asked VE Gustafson to consider a hypothetical person who was younger than Turner with a high school equivalent education and the same past relevant work as Turner. (*Id.*). He then asked the VE to assume that the hypothetical individual could occasionally lift up to twenty pounds and frequently lift up to ten pounds; stand or walk up to six hours out of an eight-hour day with normal breaks; sit up to six hours out of an eight-hour day with normal breaks; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and

occasionally balance, stoop, kneel, crouch, or crawl. (R. 346-47). VE Gustafson opined that the hypothetical individual could not perform Turner's past job as a painter as it was performed by him or as performed generally in the national economy. (R. 347). The ALJ then asked if there were any other jobs in the regional economy that the hypothetical individual could perform. (*Id.*). VE Gustafson testified that even though the individual's skills from past employment would not transfer, there are light duty, unskilled jobs that the hypothetical individual could perform. (*Id.*). These include 3,599 security jobs, 14,642 fast food jobs, 10,894 building cleaning jobs, and 15,413 room cleaning jobs in Illinois. (*Id.*).

The ALJ asked VE Gustafson to consider a second hypothetical person with the same characteristics and limitations as the first, except that he could only stand or walk for up to two hours out of an eight-hour day with normal breaks. (R. 347-48). The VE testified that there are 3,025 ticket checker jobs, 1,378 telephone interviewing jobs, 4,436 unskilled receptionist and information clerk jobs, 2,778 general office clerk jobs, 558 production inspection jobs, 2,950 production assembly jobs, and 2,004 industrial labor jobs in Illinois at the sedentary, unskilled level. (R. 348). VE Gustafson confirmed that the jobs identified are consistent with the information contained in the Dictionary of Occupational Titles. (*Id.*).

## II.  ADDITIONAL EVIDENCE

On June 14, 2006, claimant's current counsel, James Reilly, submitted additional materials to the Appeals Council. (R. 204-72, 279-95). Mr. Reilly also prepared and submitted a memorandum titled "Arguments in Support of Reversal of Decision or in the Alternative for Re-hearing," laying out the alleged errors in ALJ Gildea's opinion. (R

273-78).  Mr. Reilly submitted these documents to the Appeals Council approximately three months after ALJ Gildea issued his decision denying Turner's claim for benefits. (R. 8).  With limited exception, the additional records reflect Turner's treatment after December 31, 2004, his date last insured.  (R. 84).  On January 26, 2007, the Appeals Council made the additional documents part of the administrative record.  (*Id*.).  Also on that date, the Appeals Council denied Turner's request for a review of ALJ Gildea's decision.  (R. 5-7).[3]

The additional medical records include a note from Dr. Rutkowski, dated October 2, 2003, stating: "Patient is opting for disability.  Filled out questionnaires today.  Persists with same pain and discomfort.  No change in symptomatology."  (R. 215).  Dr. Rutkowski completed a residual functional capacity questionnaire (the "Rutkowski RFC") on October 2, 2003.  (R. 216-18).

Dr. Rutkowski described Turner's "treatment and response" as follows: "pain meds and muscle relaxers may leave a drowsy feeling."  (R. 216).  He opined that Turner is capable of low stress jobs and explained that "pain makes concentration difficult."  (R. 217).   The doctor further opined that claimant would "very frequently" be required to take unscheduled breaks of "15-20 minutes" during the work day and needed a job that permits shifting positions at will from sitting, standing, or walking. (*Id*.).  He estimated that Turner is likely to be absent from work more than four days per month.  (R. 218).

---

[3] Where, as here, the Appeals Council refuses to review a case, the correctness of the decision denying a claim for benefits depends on the evidence that was before the ALJ.  *Eads v. Secretary of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).  Accordingly, we cannot consider the new evidence in deciding whether the decision denying benefits is supported by the record as a whole.  *Id.*

On April 14, 2006, at the request of Dr. Podzamsky, Turner underwent a MRI of his lumbar plain.  (R. 206-08).  The reviewing physician found "normal alignment" of the lumbar spine with mild degenerative disc disease at the L2-3, L3-4, L4-5 and L5-S1 levels "where there is a loss of the normal disc space height as well as the normal disc fluid content."  (R. 206).   The reviewing physician concluded that the MRI revealed: "1. Minimal degenerative change at L4-5.  2. The remainder of the exam normal for the patient's age."  (R. 208).

The additional evidence also includes a report completed by Dr. Podzamsky on September 26, 2006.  (R. 290-91).  In that report, which is directed to the DDS, Dr. Podzamsky states that surgery has been "performed or recommended."  (R. 291). However, he does not provide the requested detail regarding the date and procedure(s). (*Id.*).  Dr. Podzamsky states that the "[d]ate of onset of back problem [is] 1998."  (R. 290).  The doctor also states that he last examined Turner on September 25, 2006 and that the claimant is "unable to stand 75 min can move about for a limited aspect, cannot lift, cannot sit for long periods of time."  (R. 290-91).  Finally, the additional medical records include a letter from Dr. Podzamsky, dated October 11, 2006, stating that Nurse Duffield "is fully qualified to examine and care for patients under the State of Illinois Nurse Practitioner Act."  (R. 295).

## III.   STANDARD OR REVIEW

The ALJ's decision will be affirmed if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence means more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1421 (1971)). This Court must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (citations omitted). The ALJ need not discuss every piece of evidence in the record, but "must build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*) (holding that the ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning.") (quotations omitted). If the ALJ's decision lacks adequate discussion of the issues, it will be remanded. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

## II. Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In

17

determining whether a claimant is disabled, the ALJ must consider the following five step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon*, 270 F.3d at 1176; 20 C.F.R. § 404.1520. The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that the claimant is capable of performing work in the national economy. *Id.* at 886.

The ALJ followed this five step analysis. At step one, ALJ Gildea determined that Turner was not engaged in substantial gainful activity and had not been engaged in any substantial gainful activity since the alleged onset date of June 6, 1999. (R. 27). At step two, the ALJ found that Turner had a severe impairment of discogenic disorders of the back. (R. 25, 27). The ALJ then determined, at step three, that even though Turner had severe impairments, he did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (R. 27). At step four, the ALJ found that Turner could not perform his past relevant work as a painter. (*Id.*). Finally, at step five, the ALJ determined that Turner had the capacity to perform sedentary work with additional limitations of lifting no more than ten pounds at a time and the option to alternate between sitting and standing. (*Id.*). Relying on the testimony of VE Gustafson, ALJ Gildea concluded that there are unskilled entry level jobs in the national economy that Turner could perform. (R. 28).

Turner contends that the ALJ erred in (1) failing to give controlling weight to the opinion of Nurse Duffield and (2) improperly discounting Turner's symptoms. Turner does not challenge the ALJ's finding, at step five, that there are unskilled entry level jobs in the national economy that he can perform. Turner further argues that this matter should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) because "new and material" evidence became available after the ALJ's decision.

## IV.   LEGAL ARGUMENT

### A.   The ALJ Properly Considered the Opinion of Nurse Duffield.

Under the applicable regulations, the ALJ is required to explain the weight given to the opinions of claimant's treating physicians.  20 C.F.R. § 404.1527(d)(2) (stating that "we will always give good reason in our notice of determination or decision for the weight we give your treating source's opinion.")  Generally, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in disability determinations.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Nurse Duffield concluded that Turner could not work an eight-hour day and was therefore disabled.  (R. 200).  ALJ Gildea gave Nurse Duffield's opinion "little weight." (R. 25).  Turner argues that the ALJ did not properly consider her opinion as a "medical opinion" as required under 20 C.F.R. § 414.1527(d).  "Medical opinions" are statements from physicians, psychologists, or other "acceptable medical sources" regarding the nature or severity of a claimed impairment. 20 C.F.R. § 404.1527(a)(2).  Claimant acknowledges that nurse-practitioners, such as Nurse Duffy, are not  "acceptable medical sources" whose opinions may be afforded controlling weight.  However, Turner

19

argues that a nurse-practitioner working "in conjunction" with a physician is an acceptable medical source. To support this contention, Turner cites *Gomez v. Chater*, 74 F.3d 967 (9th Cir. 1995), and *Farfan v. Apfel*, No. 97 C 4574, 1998 WL 677169 (N.D. Ill. Sept. 22, 1998), as well as Dr. Podzamsky's stamp below Nurse Duffield's signature on the 2005 RFC. (R. 201).

We begin with the ALJ's consideration of the 2005 RFC. ALJ Gildea did not specifically mention Dr. Podzamsky's stamp. However, he notes that claimant's counsel erroneously refers to the report as completed by Dr. Podzamsky. (R. 25). Moreover, by stating that he did not afford "controlling weight to [Nurse] Duffield's opinions [in the 2005 RFC] as she is a nurse and not a doctor," the ALJ rejected Turner's claim that 2005 RFC is based on Dr. Podzamsky's opinions. (R. 24). In fact, ALJ Gildea found that the report "was clearly completed in [N]urse Duffield's unique handwriting, which matches her signature." (R. 25). He further found "no indication that Dr. Podzamsky was involved in the completion of the report." (*Id.*). This finding is consistent with Nurse Duffield's records, which do not indicate that she consulted with Dr. Podzamsky regarding Turner's treatment or otherwise indicate that Dr. Podzamsky examined Turner before the hearing. (R. 194; 197-201). ALJ Gildea stated that even if Dr. Podzamsky approved the 2005 RFC, it would still be entitled to little weight because "the limitations set forth in the report are dramatically inconsistent with the x-ray and MRI evidence as well as the clinical findings." (R. 25). Accordingly, we do not find that the ALJ erred in determining that Dr. Podzamsky's stamp did not establish that he and Nurse Duffield "worked in conjunction" or by finding that the 2005 RFC contains the opinions of Nurse Duffield, not Dr. Podzamsky.

Next, claimant argues that ALJ Gildea failed to properly consider the opinion of Nurse Duffield as required under 20 C.F.R. §404.1527(d) and Social Security Ruling ("S.S.R.") 96-2p. Under the applicable regulations, an ALJ must evaluate every medical opinion regardless of its source. 20 C.F.R. § 404.1527(d). Unless a "treating source's" opinion is given controlling weight, the ALJ must consider the following factors: (1) the examining relationship; (2) the treatment relationship, including the length of treatment; (3) evidence presented to support an opinion, including medical signs and laboratory findings; (4) consistency; (5) specialization; and (6) any other factors that tend to support or contradict the opinion. *Id.* Relying on *Gomez* and *Farfan*, claimant argues that Nurse Duffield is an "acceptable source" and therefore the ALJ erred by failing to consider these factors.

As an initial matter, this Court is not persuaded that *Gomez* and *Farfan* require the ALJ to apply the factors set forth in 20 C.F.R. § 404.1527(d). Those courts relied on 20 C.F.R. § 416.913(a)(6), which was removed from the regulation on June 1, 2000. *Gomez*, 74 F.3d at 971; *Farfan*, 1998 WL 677169 at *9; 65 Fed. Reg. 34.950-52 (June 1, 2000). The then-applicable version of section 416.913(a)(6) read, "[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence." Section 416.913(a)(6) was deleted in 2000 because it was "redundant and somewhat misleading." 65 Fed. Reg. at 34.952.

Turner's reliance on S.S.R. 96-2p, is also misplaced. Under S.S.R. 96-2p, controlling weight may not be given to a treating source's medical opinion unless it is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

Even where an opinion is well-supported, it should not be given controlling weight "unless it also is 'not inconsistent' with the other substantial evidence in the case record." S.S.R. 96-2p. As discussed below, ALJ Gildea reasonably determined that Nurse Duffield's opinion is inconsistent with the opinions of Turner's treating physicians. (R. 23-25).

Finally, Turner relies on S.S.R. 06-03p, which became effective on August 9, 2006, approximately six months after ALJ Gildea issued his opinion. That ruling states that the factors in 20 C.F.R. § 404.1527(d) and § 416.927(d) "can be applied to opinion evidence from 'other sources.'" Even if this regulation were in place at the time the ALJ issued his decision, it would not require remand because the language is permissive. Therefore, S.S.R. 06-03p does not mandate that ALJ Gildea apply the § 404.1527(d) and § 416.927(d) factors to Nurse Duffield's opinions.

In fact, to the extent feasible, ALJ Gildea applied the section 404.1527(d) factors in determining that Nurse Duffield's opinions were entitled to "little weight." The ALJ noted that Nurse Duffield is a nurse-practitioner who first examined the claimant on January 21, 2002. (R. 22). He pointed out that Nurse Duffield referred to Dr. Rutkowski's records to support her opinion and did not cite any of her own clinical findings. (R. 23). The ALJ found a number of inconsistencies within Nurse Duffield's opinion, and in her opinion as compared with the record as a whole. For instance, ALJ Gildea observed that while Nurse Duffield noted that on a 1-10 scale, Turner rated his pain as a 7-10 daily, her treatment notes do not reflect such extreme pain. (*Id.*). He further observed that the limitations that Nurse Duffield found were inconsistent with the x-ray and MRI evidence, clinical findings, and the findings of Dr. Ross (R. 25), and that,

contrary to Nurse Duffield's findings, none of Turner's treating physicians had noted any muscle atrophy or significant muscle weakness. (R. 23). The ALJ found that while Nurse Duffield opined that claimant would "constantly" experience pain or other symptoms severe enough to preclude employment, she also observed, on January 27, 2003, that Turner's pain was well controlled with medication. (*Id.*).

Claimant argues that the ALJ improperly rejected Nurse Duffield's opinions because of an apparent gap in claimant's pain medications between May and October 2003. As Turner points out, the ALJ's observation that "notes from Dr. Rutkowski show that claimant did not have a prescription for Vicodin between May and October 2003" (R. 24) is contradicted by Nurse Duffield's notes showing that she refilled his prescription on July 2, 2003. (R. 194). However, because ALJ Gildea provided ample support for his decision to give little weight to Nurse Duffield's opinions, this error is harmless.

### B.    The ALJ Properly Weighed the Remaining Medical Evidence

Turner also contends that ALJ Gildea improperly "rejected" Dr. Ross' finding, on August 3, 2000, that "[i]t does not appear that the patient could function even in a sedentary capacity . . . [c]onsequently . . . his being off work completely is appropriate." (R. 157). ALJ Gildea did not give controlling weight to this opinion because, at the time it was rendered, Dr. Ross had examined the claimant only once, his examination did not reveal supporting clinical findings, and the opinion "appears to be based on the claimant's subjective complaints of pain and limitation rather than objective evidence." (R. 22). The ALJ also noted Dr. Ross' subsequent finding that "it is realistic that the claimant should be able to work at the 35-pound lifting level." (R. 22,

153). Accordingly, we are not persuaded that the ALJ erred in giving little weight to Dr. Ross' initial finding.

Turner also asserts that the ALJ erred in failing to mention "Dr. Mitchell's opinion that the [June 30, 1999] MRI indicated mild compression of his left foramen at the L4/5 and L5/S1 levels (R. 150)." The supporting citation, R. 150, is to a pain clinic consultation report prepared by Dr. Gashkoff. In that report, Dr. Gashkoff notes "[t]he patient had copies of his MRI with him which were reviewed with Dr. Mitchell from the Radiology Department who felt there was some mild compression of his left foramen at the L4/5 and L5/S1 levels." The record does not include an MRI report from "Dr. Mitchell" or any other medical records evidencing Dr. Mitchell's care and treatment of the claimant. The record does include a review of the June 30, 1999 MRI prepared by Dr. Patel. (R. 205). Consistent with Dr. Patel's findings, ALJ Gildea noted that the "[1999] MRI of the lumbar spine shows degenerative disk changes and minimal left-sided L5-S1 disk herniation." (R. 26). Accordingly, we do not find that the ALJ erred by failing to consider the Dr. Mitchell's conclusions. *See Dixon*, 270 F.3d at 1176 (noting that an ALJ is not required to address every piece of evidence in the record.").

### C.    The ALJ's Credibility Determination is not "Patently Wrong."

Next, Turner contends that the ALJ committed reversible error by discounting his statements regarding pain and other symptoms. To succeed on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference). Because the ALJ is in a superior position to assess the credibility of a witness, we will reverse an ALJ's

credibility determination only if claimant can show that it was "patently wrong."  207 F.3d at 435.

An ALJ's "assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings."  S.S.R. 96-7p; *see also Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007) (relying on S.S.R. 96-7p).  An ALJ may not discredit a claimant's testimony about his pain and limitations solely because there is no objective medical evidence supporting it.  *Villano*, 556 F.3d at 562 (*citing* S.S.R. 96-7p; 20 C.R.F. §404.1529(c)(2)).

Here, ALJ Gildea found claimant's "alleged pain and functional limitations were not fully credible as they were not supported by the medical evidence or relevant credibility factors."  (R. 27).  He further determined that claimant's "daily activities do not support the level of pain he alleges."  (R. 26).   Turner argues that the ALJ erred in his credibility analysis by: (1) discounting Turner's symptoms due to his level of daily activity; (2) substituting his judgment on the meaning of tests and clinical findings; and (3) improperly insinuating that Turner fabricated symptoms for Dr. Kahn.

First, Turner alleges that ALJ Gildea erred by neglecting to include certain "limitations associated with [his daily] activities" in connection with the credibility analysis.  Claimant does not cite supporting legal authority for the alleged error.  Moreover, claimant's argument overlooks certain limitations included in the ALJ's opinion.  For instance, ALJ Gildea noted that claimant must rest after walking for twenty minutes slowly, that he feels better when he stands up, that he cannot sit in a chair, and

that he can only stoop, and not bend.  (R. 26).  The fact that the ALJ did not note the time allotted to each activity is of little consequence, and this Court will not infer that the ALJ assumed Turner performed his activities one right after the other or for long periods of time.  Accordingly, we do not find that the ALJ's determination was "patently wrong." *Powers*, 207 F.3d at 435.

Next, claimant contends that reversal is warranted because ALJ Gildea independently determined that the findings of the x-rays and June 30, 1999 MRI could not produce the type of pain alleged by claimant.  *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJ's must not succumb to the temptation to play doctor and make their own independent medical findings.").  In the opinion, ALJ Gildea noted that "Dr. Ross stated that the x-rays show only minimal degenerative change with no evidence of fracture, spondylolysis or spondylolisthesis.  The claimant also brought with him an MRI of the lumbar spine which showed degenerative disk changes and a minimal left-sided L5-S1 disk herniation."  (R. 21).  The ALJ further stated that "Dr. Ross opined that the source of the claimant's back pain was uncertain  . . .  [and] that pain f[ro]m a lumbosacral strain should have resolved within two years of the accident."  (*Id.*)  Finally, the ALJ noted that Dr. Ross' examination "did not reveal clinical findings consistent with the claimant's alleged degree of pain, and the x-rays and MRI showed only minimal findings." (R. 22).  It is not clear to this Court how this statement amounts to an independent finding.  Rather, we find that the ALJ's statements regarding the x-rays and June 30, 1999 MRI merely summarize the medical findings included in the administrative record.  *See Latkowski v. Barnhart,* 93 Fed. Appx. 963, 972 (7th Cir. Mar. 15, 2004) (rejecting claim that ALJ succumbed to temptation to play doctor where ALJ

26

declined to order a neurological examination).

Dr. Kahn examined claimant on behalf of the DDS on May 22, 2003. (R. 181). The ALJ noted that claimant "demonstrated significantly less functional ability during the examination by the state agency doctor[] than he did during any of the prior examinations, which is suspect because he obviously knew that this examination would be used in determining whether he is disabled." (R. 23). Turner characterizes the ALJ's determination as "based on an intangible or intuitive notion about [his] credibility which S.S.R. 96-7p strictly prohibits." That ruling states that a credibility determination must be based on the entire case record and "cannot be based on an intangible or intuitive notion." S.S.R. 96-7p.

It is apparent to this Court that ALJ Gildea's statement regarding Dr. Kahn's examination is intended to explain, in part, the ALJ's election to give limited weight to that opinion. *See Diaz,* 55 F.3d at 308 (holding that an ALJ can consider a portion of a report less significant than other medical findings). The ALJ's credibility analysis is in a separate section of the opinion and is based on claimant's testimony at the administrative hearing. (R. 26). Moreover, this Court finds that the ALJ did not err in concluding that "the objective medical evidence does not establish a mechanical or neurological condition that would explain the symptoms reported by the claimant." (*Id.*). There is ample medical evidence to support this conclusion. (*Id.*); *see also Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) ("Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case."). Accordingly, we do not find, as a matter of law, that the ALJ erred in discrediting

claimant's testimony regarding the intensity, duration, and limiting effects of his symptoms. *See Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) (rejecting claimant's contention that the ALJ improperly discounted his allegations of back pain on the grounds that "the resolution of competing arguments based on the record is for the ALJ, not the court.").

### D. Request for Remand

Turner asserts that new and material evidence warrants a remand pursuant to sentence six of 42 U.S.C. § 405(g). Sentence six of § 405(g) permits the court to remand a case for further consideration "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). For sentence six purposes, "materiality means that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered, and 'new' means evidence not in existence or available to the claimant at the time of the administrative proceedings." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (quotations omitted).

Claimant essentially concedes that Dr. Rutkowski's October 2, 2003 records (R. 215-18) are not new, and therefore do not warrant remand. In his briefing before this Court, Turner seeks remand on the basis of the April 14, 2006 MRI (R. 206-09) and Dr. Podzamsky's September 26, 2006 report. (R. 290-91). The Commissioner asks this Court to find that claimant has waived his right to seek remand based on the remainder of the additional evidence. *See Repa v. Roadway Express, Inc.*, 477 F.3d 938, 942 (7th Cir. 2007) (discussing standard for waiver). We need not reach this issue. Rather, we

find that sentence six remand is not appropriate because the additional medical records are not material.

In order to be deemed material, the evidence must "relate to the claimant's condition during the relevant time period encompassed by the disability application under review." *Johnson*, 191 F.3d at 776 (*quoting Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989)). Turner was last insured on December 31, 2004. (R. 84). Accordingly, in order to receive benefits, Turner must show that he was disabled prior to December 31, 2004. *See Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) (noting that claimant must establish disability prior to the expiration of insured status).

Turner argues that the April 14, 2006 MRI and Dr. Podzamsky's report relate to his condition during the relevant time period encompassed by the disability application. Claimant also argues that it is "reasonably probable" the ALJ would have found Turner's testimony more credible if the additional evidence had been considered. To support these claims, Turner relies on Dr. Podzamsky's notation that Turner's back problems dates back to 1998. (R. 290). However, Dr. Podzamsky did not opine as to claimant's condition in 1998, nor did he offer any medical evidence regarding Turner's condition prior to 2006. *See Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th Cir. 2009) ("A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period.") (citations omitted); *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (holding that medical records "postdating the hearing" that "speak only to [the applicant's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration," do not meet the standard for new and material evidence) (citations omitted).

The April 14, 2006 MRI reveals Turner's condition on that date. (R. 292-94). Although a prior MRI was available (R. 205), it was not compared to that test. (R. 294). Moreover, the reviewing physician concluded that the April 14, 2006 MRI revealed only "minimal degenerative change at L4-5" and was otherwise normal for Turner's age. (*Id.*). In light of these facts, we cannot find that the MRI meets the requirements of materiality. *See Johnson*, 191 F.3d at 775-76 (holding that medical evidence from unadjudicated period is not relevant to review of district court's denial of sentence-six remand); *see also Liskowitz*, 559 F.3d at 742 (reasoning that it was not in error for the ALJ to refuse to credit treating physician's opinion offered after the fact).

As ALJ Gildea noted in his opinion, "in order to be awarded disability benefits . . . the claimant [was required to] show that his disability began prior to his date last insured, which in this case was December 31, 2004." (R. 21). The ALJ found Turner did not meet this burden. Turner has not shown that the new evidence would compel a different ruling. *See Kindred v. Heckler*, 595 F. Supp. 563, 567-68) (N.D. Ill. Sept. 24, 1984) (granting request for remand where new evidence related to claimant's condition within the disability period and the Court found it was "entirely possible [that] the new evidence will show the record ... in a different light."). Accordingly, Turner's request for remand is denied. *See Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008) (affirming the Appeals Council decision not to remand where new evidence proffered by claimant spoke to the alleged worsening of his condition after the relevant time period).

## V.    CONCLUSION

For the reasons set forth above, the Commissioner's motion for summary judgment is granted and Turner's motion is denied. It is so ordered.

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

DATED: June 15, 2009